**Affirmed in Part, Reversed and Rendered in Part, and Memorandum Opinion filed November 4, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00517-CV

---

### SAN JACINTO RIVER AUTHORITY, Appellant

### V.

### CORBERT BROCKER, CYNTHIA BROCKER, BRUCE BROWN JR., CYNTHIA G. BROWN, JAMES W. CALDWELL, KRISTEN A. CALDWELL, MICHAEL W. CHAMBERLAIN, LYDIA CHAMBERLAIN, MICHAEL F. COMPOSTO, GUDLANG L. COMPOSTO, ROSARIO COMPOSTO, DONNA COMPOSTO, ANIBAL DE JESUS, HILDA DE JESUS, ROSWELL DIXON, PETRINA S. DIXON, VICKI H. HITZHUSEN, WILLIAM J. HITZHUSEN, GREGORY S. KENDRICK, AMY L. KENDRICK, RICHARD KREGER, VICKI KREGER, VANCE KREIDER, PAUL MATEJOWSKY, MARIAH MATEJOWSKY, EVA R. MEREDITH, MANFRED QUENTEL, URSULA QUENTEL, AZHAR SINDHU, TEXAN LIVE MEDIA, LLC, SUNIL THAKUR, SHUBHA THAKUR, ERIC VOGL, AND LISA VOGL, Appellees

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2018-10534**

---

# MEMORANDUM OPINION

Property owners, whose properties allegedly flooded when water was released from the Lake Conroe Dam in the aftermath of Hurricane Harvey, sued the San Jacinto River Authority (SJRA) in a Harris County district court. The property owners asserted inverse condemnation claims under the Texas Constitution as well as statutory takings claims under Texas Government Code chapter 2007. SJRA filed a motion to dismiss under Texas Rule of Civil Procedure 91a, contending the property owners' claims have no basis in law or fact and SJRA's immunity from suit as a governmental entity is not waived under the circumstances. The trial court denied SJRA's motion, and SJRA brought this interlocutory appeal.

For the first time on appeal, SJRA additionally argues that the district court did not have subject matter jurisdiction in this case because the civil courts at law have exclusive jurisdiction over constitutional inverse condemnation claims filed in Harris County, citing Texas Government Code section 25.1032(c). Concluding that the district court indeed lacks subject matter jurisdiction over the constitutional inverse condemnation claims but the property owners' pleadings are sufficient to overcome SJRA's motion to dismiss on the statutory takings claims, we affirm in part and reverse and render in part.

## *Background*

Hurricane Harvey moved through the Houston area in late August 2017, bringing torrential rains and causing widespread flooding. The property owners allege that their properties, which are all downstream of the Lake Conroe Dam near the West Fork of the San Jacinto River, did not flood during Hurricane Harvey but flooded only after the rains associated with the hurricane had dissipated and a large volume of water was released from the Lake Conroe Dam into the West

2

Fork. SJRA built the Lake Conroe Dam in 1973 and has operated it since. The property owners assert that SJRA intentionally caused the flooding of their properties to protect the integrity of the dam as well as other properties and interests. The property owners further allege that this was not the first time that a release of water from the dam had caused flooding in the area where their properties are located.

As mentioned, the property owners raised inverse condemnation claims under article I, section 17 of the Texas Constitution based on the alleged physical taking of their property. Tex. Const. art. I, § 17. These claims included allegations that SJRA took an inundation, flood, flowage or drainage easement over the properties. The property owners also asserted a statutory taking under Government Code chapter 2007. Tex. Gov't Code §§ 2007.001–.045. As stated, SJRA filed a motion to dismiss pursuant to Texas Civil Procedure Rule 91a, which the trial court denied.

### *Standards of Review*

All the issues in this appeal concern the trial court's subject matter jurisdiction. Subject matter jurisdiction is essential to the authority of a court to decide a case; it therefore cannot be waived and can be raised for the first time on appeal, even sua sponte. *See Clint I.S.D. v. Marquez*, 487 S.W.3d 538, 558 (Tex. 2016); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). The existence of subject matter jurisdiction is a question of law, reviewed de novo. *See Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 451 (Tex. 2016). In assessing whether a court has subject matter jurisdiction over particular claims, we construe the pleadings liberally in favor of the pleader, look to the pleader's intent, and accept as true the factual allegations in the pleadings except to the extent negated by evidence. *Tex. Parks & Wildlife*

3

*Dep't v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004).

If the pleadings are insufficient to establish jurisdiction but do not affirmatively establish an incurable defect, the plaintiff should be afforded an opportunity to replead. *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007); *Miranda*, 133 S.W.3d at 226–27. However, if the pleadings affirmatively negate the trial court's jurisdiction, the case may be dismissed without allowing the plaintiff an opportunity to amend. *Miranda*, 133 S.W.3d at 227.

## *Discussion*

We will begin by addressing SJRA's contention regarding Government Code section 25.1032(c) and the constitutional inverse condemnation claims. We will then consider SJRA's challenges to the statutory takings claims.

## I. Constitutional Inverse Condemnation Claims

For the first time on appeal, SJRA argues that Texas Government Code section 25.1032(c) imbues the Harris County civil courts at law with exclusive jurisdiction over all inverse condemnation claims filed in Harris County, thus, the district court lacked subject matter jurisdiction over the homeowners' claims. Tex. Gov't Code § 25.1032(c). Section 25.1032(c) states in full:

> A county civil court at law has exclusive jurisdiction in Harris County of eminent domain proceedings, both statutory and inverse, if the amount in controversy in a statutory proceeding does not exceed the amount provided by Section 25.0003(c) in civil cases. Notwithstanding Section 21.013, Property Code, a party initiating a condemnation proceeding in Harris County may file a petition with the district clerk when the amount in controversy exceeds the amount provided by Section 25.0003(c). The amount in controversy is the amount of the bona fide offer made by the entity with eminent domain authority to acquire the property from the property owner voluntarily.

Tex. Gov't Code §25.1032(c).

4

In a case involving the very same release of water from the Lake Conroe Dam as is at the heart of the present case, we interpreted section 25.1032(c) as providing the Harris County civil courts at law with exclusive jurisdiction over all inverse condemnation claims filed in Harris County. *San Jacinto River Auth. v. Ogletree*, 594 S.W.3d 833, 838–40 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing *San Jacinto River Auth. v. Burney*, 570 S.W.3d 820, 825–29 (Tex. App.—Houston [1st Dist.] 2018, *aff'd sub nom*, *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618 (Tex. 2021), and *Doan v. TransCanada Keystone Pipeline, LP*, 542 S.W.3d 794, 797, 799–801, 806 (Tex. App.—Houston [14th Dist.] 2018, no pet.)); *see also San Jacinto River Auth. v. Ray*, No. 14-19-00095-CV, 2021 WL 2154081, at *2–3 (Tex. App.—Houston [14th Dist.] May 27, 2021, no pet.) (following *Ogletree*).

As we explained in *Ogletree*,

[a]lthough the homeowners suggest that section 25.1032(c) provides exclusive jurisdiction in eminent domain proceedings only when a bona fide offer by the contemnor does not exceed $200,000, the provision cannot plausibly be read to support that contention. The $200,000 cap expressly applies only to statutory condemnation proceedings and not inverse condemnation proceedings. *See Burney*, 570 S.W.3d at 828 (rejecting identical argument). As the homeowners' eminent domain claims in the present lawsuit are undisputedly inverse condemnation claims, the Harris County civil courts at law have exclusive jurisdiction, and consequently, the district court lacked subject matter jurisdiction over these claims.

594 S.W.3d at 839–40. That analysis applies equally here. The district court lacked subject matter jurisdiction over the homeowners' constitutional inverse condemnation claims including those for a partial taking or easement. Accordingly, we reverse the trial court's order denying SJRA's motion to dismiss as it relates to these claims, sever these claims from the remaining claims in the lawsuit, and

render judgment dismissing the constitutional inverse condemnation claims for lack of subject matter jurisdiction.

## II. Statutory Takings Claims

### A. Governing Law

We now turn to the property owners' statutory takings claims and SJRA's Rule 91a motion to dismiss. Rule 91a allows a party to move to dismiss a cause of action on the ground that it has no basis in law or in fact. *See* Tex. R. Civ. P. 91a.1. Dismissal is appropriate under Rule 91a "if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought [or] no reasonable person could believe the facts pleaded." Tex. R. Civ. P. 91a.1. "In ruling on a Rule 91a motion to dismiss, a court may not consider evidence but 'must decide the motion based solely on the pleading of the cause of action, together with any [permitted] pleading exhibits.'" *In re Farmers Tex. Cty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021) (quoting Tex. R. Civ. P. 91a.6).

We review the merits of a Rule 91a motion de novo because the availability of a remedy under the facts alleged is a question of law and the rule's factual-plausibility standard is akin to a legal-sufficiency review. *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724–25 (Tex. 2016) (citing *Wooley v. Schaffer*, 447 S.W.3d 71, 75–76 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). In conducting our review, we must construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true the factual allegations in the pleadings to determine whether the cause of action has a basis in law and fact. *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App.—Houston [14th Dist.] 2020, no pet.). We review the jurisdictional challenge "without delving into the merits of the case." *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

In its Rule 91a motion, SJRA asserted that the trial court did not have subject matter jurisdiction over the property owners' claims because SJRA retained governmental immunity against those claims. As a local governmental entity, SJRA generally enjoys governmental immunity from suit and liability, absent a waiver of that immunity. *See San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 618–19 (Tex. 2020); *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006); *Miranda*, 133 S.W.3d at 224–25. Texas Government Code chapter 2007, i.e., the Private Real Property Rights Preservation Act, creates liability and waives governmental immunity for viable statutory takings claims. *Medina*, 627 S.W.3d at 627, 631. The chapter defines a "taking" to include governmental actions compensable as takings under the United States and Texas constitutions, as well as less intrusive governmental actions that cause "a reduction of at least 25 percent in the market value of the affected private real property." Tex. Gov't Code § 2007.002(5). In their petition, the property owners alleged a taking both under the Texas Constitution, asserting both a taking and a partial taking or easement, and also due to actions causing a reduction of at least 25 percent of market value.

In order to prove a taking under article I, section 17 of the Texas Constitution, a plaintiff must demonstrate that the governmental entity "intentionally took or damaged their property for public use, or was substantially certain that would be the result." *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005)). SJRA asserted in its motion that the property owners have not pleaded and cannot plead sufficient facts to show SJRA (1) intentionally flooded their properties, (2) took or caused damage to their properties, or (3) did so for a public purpose. We will discuss each of these elements and related arguments in

turn.

**B. Analysis**

**1. Intent**

The requisite intent for a constitutional taking exists when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result. *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex. 2004). SJRA argues that the property owners' pleadings are deficient because they failed to sufficiently allege facts that would permit an inference that (1) SJRA knew or knew with substantial certainty that releasing water from the dam would cause damage to their specific properties, and (2) this was more than a one-time flooding event.

Among the property owners' pleadings regarding intent, they alleged in detail prior flood events in the area where their properties are located that they assert can be traced to releases from the Lake Conroe Dam. They cite a Houston Chronicle article discussing floods in 1994, 1998, and 2001 that used SJRA as a source for the information provided. They also allege such flooding occurred in 2002, 2015, 2016, and 2017 as a result of releases from the dam. The property owners emphasize that the size of the releases in those instances and the allegedly resultant flooding pale in comparison to the amount of water released and the resultant flooding in the aftermath of Hurricane Harvey.

In their pleadings, the property owners also reference a public hearing in which SJRA participated where releases from the dam were expressly linked to flooding in the area of the property owners' properties. The property owners allege in some detail the volume and flow rate of the releases from the Lake Conroe Dam, and they allege that given this large volume and high flow rate and the historical

flooding data, the fact and extent of flooding from the post-Harvey release was readily calculable for SJRA.

Additionally, the property owners quoted SJRA's Executive Director Jace Houston, who allegedly admitted in a video released by SJRA post-Harvey that "we understand there will be devastating flooding downstream but we don't have the option to stop releases to avoid the catastrophic consequences." Based on these allegations, the property owners concluded that "SJRA intended or was substantially certain that such releases of those floodwaters would inundate, flood, take, inversely condemn and sacrifice Plaintiffs' Property to benefit the public good."

As stated, SJRA contends that it is not enough that a governmental entity knew or was substantially certain that some property would be flooded, it must know or be reasonably certain that the plaintiffs' specific property would flood. In support, it cites the Texas Supreme Court opinions in *City of Dallas v. Jennings*, 142 S.W.3d 310 (Tex. 2004), and *Kerr*. These cases, however, are readily factually distinguishable from the present case. *See Burney*, 510 S.W.3d at 833–34 (distinguishing *Jennings* and *Kerr* on this same issue on very similar facts); *see also Kerr*, 499 S.W.3d at 796–97 (considering damage allegedly caused by the approval of a private development without full implementation of a flood control plan); *Jennings*, 142 S.W.3d at 315 (holding there was "no evidence that the City knew, when it unclogged the sewer line, that any flooding damage would occur [or] that the act of unclogging was substantially certain to lead to such damage"). Although the cases state some generally applicable principles of takings law, they do not directly state or support SJRA's position in this case. *See Kerr*, 499 S.W.3d at 799 ("[T]he requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially

9

certain to result.") (quoting *Gragg*, 151 S.W.3d at 555); *Jennings*, 142 S.W.3d at 314 ("[I]f the government knows that specific damage is substantially certain to result from its conduct, then takings liability may arise even when the government did not particularly desire the property to be damaged."). The United States Supreme Court, on the other hand, has directly noted the issue of whether damage to a specific property must be intended but has declined to address it. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012).

We conclude, however, that even if the property owners were required to allege that SJRA knew or was reasonably certain that their specific properties would flood, the property owners satisfied this burden for purposes of surviving a Rule 91a motion to dismiss. *See Burney*, 510 S.W.3d at 834–35 (coming to the same conclusion based on substantially similar pleadings). As set forth above, the property owners discussed in detail SJRA's knowledge of multiple prior floods that resulted from prior releases of water from the Lake Conroe Dam, as well as the fact that the volume and flow rates of those prior releases were considerably less than those occurring post-Harvey. They discuss a public hearing that involved SJRA and expressly linked dam releases to prior flooding in the areas where their properties are located. And they point to admissions by SJRA's executive director that the result of the post-Harvey release would be "devastating flooding downstream" with "catastrophic consequences." Liberally construing the property owners' pleadings, as we must, these facts were sufficient to allege SJRA's release of water from Lake Conroe was intended to, or was known to be substantially certain to, result in the flooding or exacerbated flooding of each of the property owners' specific properties. *See Sanchez*, 614 S.W.3d at 239; *Burney*, 510 S.W.3d at 834–35.

Lastly regarding intent, SJRA contends that a single flood event is generally

10

not enough to show intent, citing *Toomey v. Texas Department of Transportation*, No. 01-05-00749-CV, 2007 WL 1153035, at *4 (Tex. App.—Houston [1st Dist.] Apr. 19, 2007, no pet.) (mem. op.), and *Ahart v. Texas Department of Transportation*, No. 14-05-00027-CV, 2006 WL 2167223, at *3 (Tex. App.—Houston [14th Dist.] Aug. 1, 2006, pet. denied) (mem. op.). These cases suggest, however, not that recurrence is a requirement, but that it is simply a factor probative of a taking. *Toomey*, 2007 WL 1153035, at *4 ("In the case of flood-water impacts, recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore, substantially certain to occur."); *Ahart*, 2006 WL 2167223, at *3 (same). In response to SJRA's argument, the property owners cite cases in which only one flood event was deemed sufficient to constitute a taking. *See, e.g., City of Socorro v. Campos*, 510 S.W.3d 121, 130 (Tex. App.—El Paso 2016, pet. denied) (rejecting the contention that multiple flooding events were required and citing cases holding the same).

Moreover, regardless of whether the property owners were required to allege SJRA caused repeated flooding of their properties, we conclude they did so. As discussed in detail above, they alleged multiple floods tied to releases from the Lake Conroe Dam. *See Burney*, 510 S.W.3d at 835 (coming to same conclusion on substantially similar pleadings). The property owners sufficiently pleaded SJRA's specific intent to flood their properties.

### 2. A Taking

A taking under article I, section 17 may be physical or regulatory. *Gragg*, 151 S.W.3d. at 554. A physical taking, as was alleged here, may occur when the government physically appropriates or invades private property, or unreasonably interferes with the landowner's right of use and enjoyment. *Id*. "Causation is

11

intrinsic to a takings claim. The governmental entity sued must have taken direct governmental action, or have been the proximate cause, of the harm." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 484 (Tex. 2012). SJRA raises three arguments as to why the property owners' pleadings insufficiently allege SJRA caused their damages: (1) the flooding was caused by a confluence of waters for which SJRA cannot be held accountable, (2) the peak inflow to Lake Conroe during Hurricane Harvey exceeded the peak outflow from the dam, and (3) SJRA released water directly into the river and not onto the property owners' properties.

The property owners' pleadings regarding a taking and causation are clear and detailed. They alleged that in the aftermath of Hurricane Harvey, SJRA released water from Lake Conroe, causing the foreseeable flooding or exacerbation of flooding of their properties downstream, and such flooding caused significant damages as detailed in their petition. The property owners also asserted that their properties would not have flooded but for the water released by SJRA and would not have flooded under natural conditions.

In the alternative, the property owners alleged that the flooding on their properties was far worse than it would have been under natural conditions. They alleged that due to SJRA's actions, the flooding arrived more quickly and with less warning than otherwise would have occurred, and the floodwaters arrived with more force and velocity and with higher flow rates than would have occurred under natural conditions. As a result, the property owners alleged that the flooding at their property was deeper than otherwise would have occurred, and it lasted for a longer period of time.

Turning to SJRA's assertions, we first note that SJRA's arguments regarding a confluence of waters and that peak inflow to the lake exceeded peak outflow rely largely on information from several web pages and web page printouts of which

12

SJRA requested we take judicial notice. Because Rule 91a motions must be resolved solely on the pleadings, we decline to consider these items. *See In re Farmers*, 621 S.W.3d at 266; *see also Burney*, 570 S.W.3d at 830–31 (declining to take judicial notice of similar evidence in similar case).

In support of two of its arguments—confluence of waters and the release was into the river and not directly onto appellants' properties—SJRA relies primarily on the court of appeals opinion in *Wickham v. San Jacinto River Authority*, 979 S.W.2d 876, 883 (Tex. App.—Beaumont 1998, pet denied). *Wickham*, however, was decided before the Texas Supreme Court issued its opinion in *Gragg*, which affirmed a takings judgment on evidence that a water district released lake water directly into a river during heavy rains and the water traveled about eight miles downstream before causing flood damage. 151 S.W.3d at 551–55 (finding evidence sufficient to demonstrate causation in takings claim where plaintiff demonstrated construction and operation of dam exacerbated effects of flooding); *see also Ark. Game & Fish*, 568 U.S. at 27–28 (holding property owner 115 miles downstream from dam could maintain federal takings claim); *Burney*, 510 S.W.3d at 836 (distinguishing *Wickham* in light of *Gragg*).

SJRA additionally cites the supreme court's *Kerr* opinion in support of its confluence argument. Although the *Kerr* court explained that "[t]he determination of whether a taking has occurred . . . may turn on the confluence of particular circumstances," the case offers no support for the proposition that a government entity cannot be held to have proximately caused flooding simply because the water it released mixed with other water before any water flooded the plaintiffs' properties.[1] Indeed, as stated, *Gragg* and other cases support the opposite

---

[1] The supreme court discussed the "confluence of particular factors" in *Kerr* as follows:

We hold that the homeowners have not presented a cognizable takings claim

13

conclusion. *See Ark. Game & Fish*, 568 U.S. at 27–28; *Gragg*, 151 S.W.3d at 551–55; *Burney*, 510 S.W.3d at 836.

We further note regarding the confluence argument that the property owners alleged that none of their properties had been flooded until the water released from Lake Conroe had time to make its way downstream and either flood the properties or move or displace water from other sources and cause it to flood or exacerbate the flooding of their properties. The property owners are not simply alleging that the released water was merely part of the waters that flooded their properties; they allege the release of water caused or exacerbated the flooding.

In support of its argument that as a matter of law it cannot be liable for a taking when the peak inflow to Lake Conroe during Hurricane Harvey exceeded the peak outflow from the dam, SJRA cites *Sabine River Authority of Texas v. Hughes*, 92 S.W.3d 640 (Tex. App.—Beaumont 2002, pet. denied). Although the court in *Hughes* mentions in that case, "the flow into the reservoir was 385,000 cubic foot per second (cfs) while outflow, at its peak, was only 117,644 cfs," it is not entirely clear what role that information played in the outcome of the case. *Id.* at 642. Neither the court in *Hughes* nor SJRA has offered any explanation as for

where (1) the County never desired to cause flooding, but desired only the opposite, (2) it undertook significant efforts to prevent flooding, spending tens of millions of dollars over many years, (3) the County never intended, as part of a flood-control plan, to use the homeowners' particular properties for detention ponds, drainage easements, or the like, (4) the only affirmative conduct allegedly causing the flooding was approval of private development, (5) the homeowners offered no proof that the County was substantially certain its approval of development would result in the flooding of the homeowners' particular lots, and (6) even by the homeowners' reckoning the flooding resulted from multiple causes—Acts of God, the activities of other defendants, the alleged failure to complete the Pate Plan, and the approval of private development. We have never recognized a takings claim under such attenuated circumstances. This is not a case where the government made a conscious decision to subject particular properties to inundation so that other properties would be spared . . . .

499 S.W.3d at 806–807.

14

why this comparison—peak inflow to peak outflow—would bar a takings claim as a matter of law. Here, presuming peak inflow may have exceeded peak outflow, the property owners pleaded that over the two-day release period at issue in this case, SJRA released significantly more water from the dam than was flowing into Lake Conroe during that period, releasing water at almost 80,000 cfs for more than twenty-four straight hours and at rates exceeding the previous record release rate of 33,360 cfs for about 48 straight hours. Looking simply at two distinct points in time to determine a peak inflow rate and a peak outflow rate does not prove SJRA did not cause downstream flooding on the property owners' properties. The property owners' pleadings sufficiently alleged a taking and causation. *See Hearts Bluff Game Ranch*, 381 S.W.3d at 484.

### 3. Public Purpose

Underlying the takings clause of the Texas Constitution is the notion that "the government should not 'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Gragg*, 151 S.W.3d at 554 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960), and *Steele v. City of Houston*, 603 S.W.2d 786, 789 (Tex. 1980)). However, it is also important "to ensure that the public does not bear the burden of paying for property damage for which it received no benefit." *Id*. SJRA asserts that the property owners' pleadings are deficient in regards to the public use element because they are conclusory and Lake Conroe was not built and is not run for the purposes of flood control. SJRA also attempts to analogize this case to the accidental burning of a hay crop in *Texas Highway Department v. Weber*, 147 Tex. 628, 219 S.W.2d 70 (1949). We find no merit in these arguments.

Regarding the public-use element, the property owners' pleadings are clear and detailed. They alleged that in the aftermath of Hurricane Harvey, SJRA faced a

choice between doing nothing as the water level rose in Lake Conroe and accept all the associated risks or release water in amounts it knew would cause "devastating flooding downstream" with "catastrophic consequences." According to the property owners, SJRA "chose the latter option and intentionally, knowingly, affirmatively and consciously inundated, flooded, took, inversely condemned and sacrificed [the property owners' properties] for the greater public good." The property owners specifically alleged SJRA chose to sacrifice the property owners' properties in order to protect the stability and integrity of the dam, its earthen embankment, and related infrastructure; ensure the lake would continue to be available for vital freshwater storage and for recreational activities once the storm and its effects had passed; protect and spare homes and other properties on the lake and upstream from flooding; minimize the danger to the public by keeping docks, bulkheads, small islands, and other structures unsubmerged for as long as possible; minimize the danger to the public associated with electrical outlets and equipment coming into contact with water; and enable the lake and adjacent parks and roads to reopen and become fully operational as quickly as possible for the public's benefit.

The property owners also asserted SJRA lowered the lake level "to prevent water from overflowing or 'overtopping' the lake's spillway gates because those gates were not designed to withstand the force and water pressure that would exist if water overflowed those gates." The property owners' pleadings on the public use element were not conclusory, and SJRA's argument to the contrary is meritless. *See Burney*, 510 S.W.3d at 837–38 (holding similar pleadings sufficiently alleged a public purpose); *City of El Paso v. Mazie's L.P.*, 408 S.W.3d 13, 24 (Tex. App.—El Paso 2012, pet. denied) (holding allegation that a dam was constructed for the purpose of diverting floodwaters from affluent residential neighborhoods into a

16

drainage system that inevitably caused flooding of downstream properties raised a fact question on public purpose).

Relying again on *Wickham*, SJRA next contends that the water release was not for a public purpose because its government mandated powers do not include functioning as a flood control facility. 979 S.W.2d at 878 ("Neither Lake Conroe nor its Dam was designed to function as a flood control facility, but simply exists to maintain a level of water so as to supply its customers with a previously contracted amount of water."). The property owners allege, however, and SJRA does not dispute, that it was authorized to store water in Lake Conroe and operate and manage the Lake Conroe Dam and that it released water from the dam in this instance to protect the water supply, the dam, and related infrastructure and resources. Indeed, in its briefing to this court, SJRA acknowledged that "[w]hen the construction on Lake Conroe was completed in 1973, the SJRA was charged with upholding its mission to protect the San Jacinto River basin in and around Lake Conroe, including releasing floodwater from the dam if need be." We also note that in *Gragg*, the water district defendant's government-mandated function was similar to SJRA's, yet the supreme court held that the evidence supported the finding that the damage the takings plaintiff experienced was "the inevitable result of the reservoir's construction and of its operation as intended." 151 S.W.3d at 550, 555; *see also Burney*, 510 S.W.3d at 837–38 (declining to follow *Wickham* in similar circumstances). SJRA's citation to *Wickham* is unavailing.

Lastly, SJRA attempts to analogize the facts of this case to those addressed in *Weber*, which involved the unintended and negligent burning of a hay crop that was not done for any public purpose. 219 S.W.2d at 71–72. *Weber* is readily distinguishable and neither controlling nor instructional in the present circumstances. *See Burney*, 510 S.W.3d at 838 (distinguishing *Weber* in similar

17

circumstances by stating "that case is not comparable to the homeowners' claim of intentional flooding of their properties to avoid flood damage to the dam, the lake's infrastructure, and properties on the lake and upstream"). We conclude that the homeowners have sufficiently pleaded the public-use element of their constitutional takings claims.

As set forth above, the property owners have sufficiently pleaded their constitutional takings claims. Having done so, they also sufficiently pleaded a statutory takings claim under Government Code section 2007.002(5) and, thus, a waiver of governmental immunity under chapter 2007. *See Burney*, 510 S.W.3d at 838.

### *Conclusion*

We reverse the trial court's order denying SJRA's motion to dismiss as it relates to the constitutional inverse condemnation claims, sever these claims from the remaining claims in the lawsuit, and render judgment dismissing the constitutional inverse condemnation claims for lack of subject matter jurisdiction. We affirm the trial court's order denying SJRA's motion to dismiss as it relates to the statutory takings claims.

/s/     Frances Bourliot
          Justice

Panel consists of Justices Jewell and Bourliot and Senior Justice Simmons.